1  FRANK N. DARRAS #128904
2  LISSA A. MARTINEZ #206994
   SHERNOFF BIDART DARRAS ECHEVERRIA, LLP
3  3257 East Guasti Road, Suite 300
   Ontario, CA  91761
4  Telephone:   (909) 390-3770
   Facsimile:   (909) 974-2121
5  Email: fdarras@sbd-law.com; lmartinez@sbd-law.com
6
   Attorneys for Plaintiff
7  E-filing
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10
11  ANTHONY HEYMANN,              CV    08  No.:   2540
12              Plaintiff,        COMPLAINT FOR BENEFITS UNDER
                                  A GROUP DISABILITY EMPLOYEE
13        vs.                     BENEFIT PLAN
14  HARTFORD LIFE AND ACCIDENT
15  INSURANCE COMPANY; SAFEWAY
    GROUP HEALTH PLAN 501,
16
             Defendants.
17
18
19       Plaintiff alleges as follows:

20       1.    This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1337

21  and 29 U.S.C.§1132(a), (e), (f) and (g), of the Employee Retirement Income Security

22  Act of 1974, 29 U.S.C. § 1101, et seq. (hereafter "ERISA") as it involves a claim by

23  Plaintiff for Disability benefits under an employee benefit plan regulated and governed

24  under ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C.

25  § 1331 as this action involves a federal question.

26       2.    The events or omissions giving rise to Plaintiff's claim occurred in this

27  judicial district, thus venue is proper here pursuant to 28 U.S.C. §1391(b)(2), and the

28  ends of justice so require.

1      3.      The ERISA statute at 29 U.S.C. § 1133, in accordance with Regulations of

2    the Secretary of Labor, provides a mechanism for internal appeal of benefit denials.

3    Those avenues of appeal have been exhausted.

4      4.      Plaintiff is informed and believes and thereon alleges that Defendant,

5    SAFEWAY GROUP HEALTH PLAN 501, is an employee welfare benefit plan

6    established and maintained by Safeway, Inc. (which, Plaintiff alleges upon information

7    and belief, does business in the State of California), to provide its employees, including

8    Plaintiff, with income protection in the event of a disability, and, is the Plan

9    Administrator.

10      5.      Plaintiff alleges upon information and belief that Defendant, HARTFORD

11    LIFE AND ACCIDENT INSURANCE COMPANY ("HARTFORD"), is, and at all relevant

12    times was, a corporation duly organized and existing under and by virtue of the laws of

13    the State of Connecticut, authorized to transact and transacting the business of

14    insurance in this state, and the Claims Administrator for the Plan.

15      6.      At all relevant times Plaintiff was an employee of Safeway, Inc. and a

16    participant in the Plan.

17      7.      Defendant, HARTFORD issued Group Policy number GLT 034594 to

18    Safeway, Inc. to insure its Plan, and the eligible participants and beneficiaries of the

19    Plan, including Plaintiff. That Policy promised to pay disability benefits if MR.

20    HEYMANN should become disabled. A copy of the Certificate of Insurance, issued

21    pursuant to the Policy is attached hereto as Exhibit "A." Therefore, HARTFORD suffers

22    from a structural conflict as it funds the plan and decides whether the claimants will

23    receive benefits under the Plan[1].

24      8.      The Plan provides for long term disability ("LTD") and life insurance benefit

25    _____

26    [1] According to the recent case of *Saffon v. Wells Fargo & Co. Long Term Disability Plan* (F.3d, 2008 WL
80704 (9th Cir. (Cal.) Jan. 9, 2008): "In *Bruch*, the Supreme Court instructed us to 'weigh[]' a fiduciary's

27    'conflict of interest' as 'a facto[r] in determining whether there is an abuse of discretion.'...MetLife labors
under such a conflict of interest: It both decides who gets benefits and pays for them, so it has a direct

28    financial incentive to deny claims...The danger pervades the ERISA-plan world that a self-interested plan
decision maker will take advantage...to line its own pockets by denying meritorious claim."

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

as follows:

| Term | Provision |
|---|---|
| Elimination Period | The Elimination Period is the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following:<br><br>1. with respect to classes<br>   a) 1, 2, and 5 – the first 6 consecutive month(s)<br>   b) 3 and 4 – the first 90 consecutive days of any one period of Disability; or<br>2. with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program. |
| Benefit Percentage | 60% |
| Monthly Benefit | **Maximum Monthly Benefit:**<br>Classes 1, 3 and 5: $12,500<br>Classes 2 and 4: $17,500<br><br>Minimum Monthly Benefit: $50 |

| Maximum Duration of Benefits Table | Age When Disabled | Benefits Payable |
|---|---|---|
| | **Prior to Age 60** | **To Age 65, or for 60 months, if greater** |

| Disability | Disability or Disabled means that during the Elimination Period and for the next 24 months you are prevented by:<br><br>1. accidental bodily injury;<br>2. sickness;<br>3. Mental Illness;<br>4. Substance Abuse; or<br>5. pregnancy,<br>from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings |

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

| Term | Provision |
|------|-----------|
| | are no more than 80% of your Indexed Pre-disability Earnings.<br><br>After that, you must be so prevented form performing one or more of the Essential Duties of Any Occupation. |
| **Essential Duty** | Essential Duty means a duty that:<br>1. is substantial, not incidental;<br>2. is fundamental or inherent to the occupation; and<br>3. cannot be reasonably omitted or changed. |

9.      Prior to his disability, MR. HEYMANN had been employed with Safeway, Inc. as a retail store manager since about 1983.

10.      On or about March 27, 2001, MR. HEYMANN became disabled under the terms of the Plan due to back pain, as certified by his treating physician, Dr. Robert Lieberson, a Diplomate of the American Board of Neurological Surgeons, and submitted a claim to HARTFORD.

11.      On or about January 29, 2002, HARTFORD wrote to MR. HEYMANN and advised him that it had approved his claim. According to HARTFORD's letter:

- "We are pleased to inform you that we have approved your claim for Long Term Disability (LTD) benefits."
- "As of 09/27/2003, Disabled means you must be so prevented from performing one or more of the Essential Duties of Any Occupation."

12.      Despite a few unreasonable, arbitrary and capricious denials early in the claim, HARTFORD reversed those denials and continued to pay MR. HEYMANN his disability benefits, after his appeals, for about six (6) years (including about 3 ½ years of "Any Occupation" disability) when it once again unreasonably, arbitrarily and capriciously denied him benefits.

13.      During this time frame, MR. HEYMANN continued to receive treatment for

SHERNOFF BIDART DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1   his disabling medical condition including, but not limited to, the following:

| Date | Treatment/Medical Notation |
|---|---|
| 02/15/2002 | **OPERATION**<br><br>Redo left, L5-S1 laminectomy and discectomy;<br><br>Redo right, L5-S1 laminectomy, discectomy and foraminotomy;<br><br>Intertransverse fusion, L5-S1;<br><br>Interbody fusion, L5-S1;<br><br>Placement of interbody machine boned dowels, L5-S1;<br><br>Segmental fixation with surgical dynamics 90-D pedicle screws and rods;<br><br>Harvest, local autograft. |
| 03/31/2003 | **HOSPITAL ADMISSION**<br><br>The patient is a 36 year old male who was seen for a preoperative physical examination prior to undergoing exploration of lumbar fusion and removal of hardware at the L4-5 levels.<br><br>At the time of physical examination his main complaint was low back pain, predominantly on the left side, radiating to the left leg.<br><br>He originally hurt his back in the course of his duties as a Safeway store manager back in 1999.<br><br>He is status post L5-S1 hemilaminectomy and discectomy and actually returned to work for six months.<br><br>He reinjured his back in the course of his work in March 2001.<br><br>He was treated conservatively but failed and his MRI changes showed severe discogenic disease at the lowest two levels. |

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

| Date | Treatment/Medical Notation |
|---|---|
| | In addition, he had foraminal stenosis, worse on the left than the right. |
| | He underwent a discogram which was positive at the L5-S1 level. |
| | Subsequent to this he underwent lumbar fusion at the L5-S1 on February 13, 2002. |
| | Since the lumbar fusion he continued to have back and left leg pain. |
| | In addition to the left leg pain he complains of left foot pain on the lateral aspect of the left foot. |
| | Dr. Lieberson has discussed the risks, benefits and alternatives with this patient, including infection; bleeding; neurological damage. |
| | "There is no guarantee that the proposed surgical procedure will eliminate the patient's symptoms and that further intervention will be needed." |
| 04/07/2003 | **OPERATION** Exploration of previously completed segmental fusion; removal of previously placed segmental fixation hardware; augmentation of intertransverse fusion; allograft for spine. **INDICATIONS**: The patient has a long history of back pain. |

| Date | Treatment/Medical Notation |
|---|---|
| | Complaints improved following fusion but have recently worsened. Complaints have included lower extremity pain. |
| 04/09/2003 | Hospital Discharge Summary: **DISCHARGE DIAGNOSIS**: Failed back syndrome **REASON FOR ADMISSION**: The patient has a long history of back and lower extremity pain, improved but not relieved by fusion. The patient was admitted to the hospital on 4/7/03. On the day of admission, he was taken to the operating room and the lumbar fusion was explored and the hardware was removed. |
| 08/21/2003 | "...he still has considerable pain, which is worse after prolonged sitting and prolonged standing." "Mr. Heymann is now four months following removal of hardware from a prior lumbar fusion." "He is progressing nicely, however, he is by no means better." "Mr. Heyman is temporarily totally disabled and will not be able to do any form of work for approximately six months from now." (Dr Panganiban's Records) |
| 09/10/2003 | Dr. Lieberson's letter to Hartford: "You have received...[several] reports from my office indicating the patient is completely unable to work for a period of six months." |

| Date | Treatment/Medical Notation |
|------|---------------------------|
| | "...the patient was most recently seen on August 21, 2003." |
| | "At that time it was our assessment that the patients remains totally disabled and was unable to perform work of any type." |
| | "The patient's complaints continue to be severe and examination continues to note severe muscle spasm and loss of range of motion in the back." |
| | "Given severe stated subjective verified by clear objective, I would recommend that the patient not work." |
| | "With regard to what the patient can do based upon substantiated objective findings, it is my current opinion that based upon substantiated objective findings, the patient cannot work." |
| 08/31/2004 | "...his symptoms have essentially remained unchanged. He continues to have low back pain."<br><br>"He activities...have been curtailed by the back pain."<br><br>"Mr. Heymann is symptomatic but stable." (Dr. Panganiban, Diplomate, American Board of Family Practice) |
| 03/30/2005 | "...he has good days and bad days."<br><br>"He is still working on a conditioning program to help manage his lower back condition."<br><br>"...two months ago, he developed left knee pain. Since that time, |

- 8 -

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

| Date | Treatment/Medical Notation |
|------|---------------------------|
| | he has been experiencing left knee pain with...any lateral movements regarding his left knee." |
| | "Anthony's back condition is stable but symptomatic." |
| | "His clinical examination suggests arthritis regarding his patella." (Dr. Lieberson's Records) |
| 04/21/2005 | Social Security notification of disability determination. "...you are entitled to monthly disability benefits from Social Security beginning September 2001[2]." |
| | (NOTE: Based upon information and belief, Plaintiff alleges that The Social Security Law Group was retained by HARTFORD to secure social security benefits. Therefore, Plaintiff alleges at all relevant times herein, The Social Security Law Group was acting as an agent of HARTFORD in proving MR. HEYMANN's disability and his inability to work in any gainful employment[3].) |
| 07/13/2005 | "Anthony returns for a follow-up appointment regarding his lower back and left knee." |
| | "He continues to have chronic symptoms regarding his lower back |

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

---

[2] According to the Social Security definition of disability, which is more stringent than the subject Plan's Disability definition: "A person is disabled, and thereby eligible for Social Security disability insurance benefits and Supplemental Security Income (SSI), "only if his physical or mental impairment or impairments are of such severity that *he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.*" 42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B) (emphasis added).

[3] Based upon information and belief, Plaintiff alleges that on or about September 20, 2004, The Social Security Law Group submitted an invoice to HARTFORD for payment of $4,000.00 as a result of obtaining the Social Security award.

| Date | Treatment/Medical Notation |
|------|----------------------------|
| | with pain radiating down to his left lower extremity, down to his foot." |
| | "He returns today for a refill of his narcotic medication." |
| | "He continues to be on disability and off work." |
| | **IMPRESSION**: Lumbar disc disease status post April 7, 2003, hardware removal and two lumbar surgeries; left knee patellofemoral syndrome/chondromalacia, possible plica. |
| | **PLAN**: "Anthony's condition remains stable but symptomatic." |
| | "He would like to continue with conservative treatment." |
| | "I've encouraged him to continue with his home conditioning program." |
| | "Anthony's Norco[4] was refilled today...I've given him a trial of Relafen[5]." (Dr. Lieberson's Records) |
| 12/20/2005 | "...his back condition has worsened in the last three months." |
| | "He has right sided low back pain with numbness in his bilateral |

[4] This medication, also known as Hydrocodone (a narcotic)/Acetaminophen, has the following side effects: nausea; vomiting; constipation; lightheadedness; dizziness; drowsiness; vision changes and mental/mood changes.

[5] Side effects of this nonsteroidal anti-inflammatory medication include upset stomach; diarrhea or constipation; nausea; vomiting; unusual fatigue; drowsiness and headache.

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

| Date | Treatment/Medical Notation |
|------|----------------------------|
|  | lower extremities." |
|  | "...the patient's physical examination is significant for diminished range of motion....weakness regarding his left foot and absence of his left ankle reflex." (Dr. Lieberson's Records) |
| 01/31/2006 | **ATTENDING PHYSICIAN'S STATEMENT**<br><br>**DIAGNOSIS**: "Chronic lumbar disk disease...3 lumbar surgeries."<br>Date patient became unable to work due to this impairment? Month: 3; Day: 29; Year: 2001.<br><br>**TREATING PHYSICIAN'S PROGRESS REPORT**<br>"MRI scheduled next week."<br><br>"His condition remains unchanged and unimproved. He continues to have low back pain and pain radiating down his bilateral lower extremities, left worse than right. He is currently on Norco, Relafen, Elavil[6] and Flexeril[7]. He continues to be off work. In the past month, Anthony has developed a new left L5 radiculopathy with worsening of his left extensor hallucis longus." (Dr. Lieberson's Records) |

14.    On or about January 8, 2007, HARTFORD had MR. HEYMANN's medical records reviewed by a company known as Medical Advisory Group ("MAG"), a company

---

[6] Side effects of this anti depressant include blurred vision, constipation; low blood pressure upon standing, and increased risk of seizures.

[7] Side effects of this muscle relaxant include drowsiness; fatigue; dizziness; lightheadedness and blurred vision.

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1    with known financial ties to HARTFORD since in or about 1999. The doctor who

2    performed the review, Todd J. Lyon, M.D., is not an orthopedic surgeon or a

3    neurosurgeon, but a family physician, and, therefore not qualified to offer an opinion on

4    a gentleman with two prior back surgeries that have failed to relieve his back pain. The

5    financial ties of MAG and HARTFORD along with the lack of expertise of Dr. Lyon

6    further heightens the level of skepticism with which this court will view HARTFORD's

7    subsequent conflicted administrator's decision to deny MR. HEYMANN disability

8    benefits under the terms of the Plan.

9        15.    Despite the fact that MR. HEYMANN had two (2) previous failed back

10    surgeries during the course of this claim, and based largely upon the medical records

11    review of MAG's Dr. Lyon, on or about January 30, 2007, HARTFORD unreasonably,

12    arbitrarily and capriciously denied further benefits to MR. HEYMANN. In that letter,

13    HARTFORD alleged that "...your claim does not establish that you continue to meet the

14    Policy definition of Disability as of 1/19/07."

15        16.    Less than four (4) months later, MR. HEYMANN underwent fusion of his

16    lumbar spine due to his disability, thereby completely negating any findings of non-

17    disability by the financially conflicted MAG doctor and HARTFORD's denial of benefits.

18        17.    Providing further proof of disability, on or about April 19, 20007, MR.

19    HEYMANN was once again evaluated by Dr. Lieberson who subsequently noted in his

20    neurosurgery chart note:

21              • "The patient comes with left lower extremity weakness to 3-4/5 in the

22                 tibialis anterior and extensor hallucis longus."

23              • "He has matching L5 numbness."

24              • "He has a new MRI scan...The L4-5 level now shows new lateral zone

25                 stenosis bilaterally."

26              • "The disc appearance is far worse than had been the case."

27              • "I have recommended strongly that he consider an additional surgery

28                 to get the disc removed."

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1       • "In this case, unfortunately, it does include a fusion."

2       • "The last several surgeries have been so overwhelming for him...he is

3          going to make a list of questions, come back in one week, and talk to

4          me again..."

5       18.    On or about April 19, 2007, Dr. Lieberson also wrote to HARTFORD and

6   stated the following:

7       • "At this point, Mr. Heymann is anticipating a new spinal fusion surgery."

8       • "He has a footdrop on the left."

9       • "The L4-5 level needs to be fused."

10      • "There is no doubt in my mind that the patient is now, and has been

11         disabled."

12      • "With my explicit approval, for up to a couple hours...[a] day, Mr.

13         Heymann may do most activities."

14      • "He cannot, however, return to work."

15      • "I am not aware of any employer that will allow him to work only one or

16         two hours a day."

17      19.    On or about April 25, 2007, Dr. Lieberson completed a Treating

18   Physician's Progress Report which indicated the following:

19      • "We will be doing posterior fusion at L4/5 pending Pt's approval."

20      • "Spent 30 minutes reviewing risks and benefits of surgery with

21         patient..."

22      • "Pt wants to go ahead but will give final answer...next week."

23      20.    MR. HEYMANN gave his approval for the surgery, and, on or about May

24   7, 2007, he wrote to HARTFORD and informed them of the upcoming operation as

25   follows:

26      • "...we have set up a date for my surgery of May 25, 2007, to remove

27         what is left of the disc and fuse the bones based upon my doctor's

28         recommendation."

SHERNOFF BIDART
DARRAS ECHEVERRIA⅗
LAWYERS FOR INSURANCE POLICYHOLDERS

1    • "...I have enclosed a copy of the letter sent to you by my surgeon, Dr.
2        Robert E. Lieberson dated April 19, 2007..."

3    21.    On or about May 25, 2007, MR. HEYMANN was admitted to ValleyCare
4    Medical Center for his surgery. According to the History and Physical notes on that
5    date:

6    • "The patient's history is extremely complex..."
7    • "He is status post lumbar fusion, L5-S1."
8    • "He has undergone removal of hardware."
9    • "He presents with recurrent symptoms including left lower extremity
10       pain, numbness, and footdrop."
11   • "The disk surgery is going to include a fusion...as it is felt that is a
12       simple diskectomy were completed, the patient would almost
13       immediately fail and require a fusion."
14   • **LABORATORY FINDINGS**: MRI scan of the lumbar spine shows
15       evidence of a significant disk herniation on the left at L4-5.
16   • **IMPRESSION**: Lumbar radiculopathy with footdrop
17   • **PLAN**: Lumbar laminectomy and fusion, L4-5, possible extension to
18       L5-S1.
19   • "He understands that the risks include bleeding, infection, neurological
20       injury, numbness, weakness, bowel or bladder problems, possible
21       nonunion, the probable need for additional procedures, possible failure
22       at levels above in the future, the risks related to the anesthetic, and
23       even the risk of death."

24   22.    On or about July 10, 2007, HARTFORD wrote to MR. HEYMANN and
25   stated the following:

26   • "We are in receipt of your July 6, 2007 letter which included a copy of
27       your June 27, 2007 letter and the July 5, 2007 Treating Physician's
28       Progress Report completed by Dr. Robert E. Lieberson."

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1        • "...we received your 11 page fax on June 28, 2007 and have added
2          this information to your claim file for review."

3        • "We forwarded the medical information in your claim file, as well as
4          your May 7, 2007 letter, to the University Disability Consortium (UDC)
5          on July 3, 2007 for an independent physician review and will continue
6          with our investigation once we have received a response."

7    23.    However, any review done by UDC is not "independent", as HARTFORD
8 has an exclusive financial relationship with UDC.  And, the medical record reviewing
9 doctor utilized by UDC is also financially conflicted, thereby further heightening the level
10 of skepticism with which a court will view this already conflicted administrator's
11 subsequent denial of benefits decision[8].

12    24.    Plaintiff alleges upon information and belief that any report from UDC is
13 immediately suspect as UDC's financial success is clearly dependent upon its
14 relationship with HARTFORD, which would not continue *if* UDC physicians were
15 generating opinions unfavorable to HARTFORD.[9]

16    25.    In fact, Plaintiff alleges upon information and belief that:

17        • **In 2002, Hartford** referred 1,425 claims to UDC for review and
18          **paid UDC** a total of **$1,379,860** for its services.

19        • **In 2003, Hartford** referred 1,575 claims to UDC for review and

20

21 ─────────────────────

[8] "As we read *Abatie*, when reviewing a discretionary denial of benefits by a plan administrator who is
22 subject to a conflict of interest, we must determine the extent to which the conflict influenced the
administrator's decision and discount to that extent the deference we accord the administrator's decision.
23 In so doing, we seek to overcome the "serious . . . danger of conflicted plan decision-making" illustrated
by the Unum-Provident scandal." [*Saffon v Wells Fargo & Co. Long Term Disability Plan* (F.3d,
24 2008 WL 80704 (9th Cir. (Cal.) Jan. 9, 2008)]

25 [9] Hartford is UDC's biggest client, and UDC markets itself in terms of its ability to save their clients
money. UDC's inherent bias favoring HARTFORD requires viewing any UDC report with a great deal of
26 skepticism. *See Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir.
2001) (expressing concern over an insurer repeatedly hiring the same physicians as experts).  In fact, the
27 Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an
incentive to make a finding of not disabled in order to save their employers money and to preserve their
28 own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S. Ct.
1965, 1971(2003) (quotations omitted).

SHERNOFF BIDART
DARRAS ECHEVERRIA;
LAWYERS FOR INSURANCE POLICYHOLDERS

1      **paid** UDC a total of **$1,807,054** for its services.

2          • **In 2004, Hartford** referred 2,185 claims to UDC for review and

3      **paid UDC** a total of **$2,781,328** for its services. (NOTE: That is

4      approximately a 102% increase in just two years' time. Additionally,

5      Plaintiff alleges upon information and belief that this close financial

6      relationship has continued to date[10].)

7      26.    Additionally, the review was done by a financially conflicted physician, Dr.

8      Robert Pick[11]. Plaintiff alleges upon information and belief:

9          • From on or about 2004 to at least April of 2007, Dr. Pick spent

10             approximately 80% of his professional time devoted to conducting

11             medical record reviews (approximately 20 reviews per week) for

12             several record reviewing companies, including UDC;

13         • From on or about 2004 to at least April of 2007, more than 80% of Dr.

14             Pick's income was generated by conducting said medical record

15             reviews; and,

16         • Dr. Pick last performed an orthopedic surgery in or about 1987,

17             therefore calling into question his expertise in reviewing a medical

18             condition that has been classified as having an "extremely complex"

19             history.

20     27.    Even though MR. HEYMANN had undergone yet another major back

21     surgery during his appeal time, on or about August 7, 2007, HARTFORD unreasonably,

22

23     [10] Indeed, in the recent central district court case before the Honorable Judge Gary Fees [*Hicklin v.*

24     *Hartford*; Case Number CV06-4543 GAF (JTLx)], Judge Fees noted, on or about December 12, 2007,
       that: "UDC maintains a contractual relationship with Hartford under which it derives 75% of its annual

25     income by providing file reviews for Hartford."

26     [11] Additionally, according to Findings of Fact and Conclusions of law on or about December 12, 2007, of
       the Honorable Judge Fees in the *Hicklin v. Hartford* case: "Hartford never arranged for an IME and had

27     the file reviewed by physicians [Dr. Turner and Dr. Pick] who were themselves severely conflicted.
       "Indeed, it appears that the initial file review by Dr. Turner was conducted so poorly and with such

28     obvious bias in favor of Hartford, that Hartford deemed it necessary to obtain a second, more defensible,
       file review before finally denying benefits. The second review, by Dr. Pick, however, was equally deficient
       and biased."

SHERNOFF BIDART
DARRAS ECHEVERRIA?
LAWYERS FOR INSURANCE POLICYHOLDERS

1    arbitrarily and capriciously upheld its prior denial of benefits.

2        28.    To date, even though MR. HEYMANN has been, and remains, disabled,

3    as evidenced by the medical documentation, Defendants have not paid MR. HEYMANN

4    any disability benefits from on or about June 8, 2006. The arbitrary and capricious

5    nature of Defendants' denial decision is evidenced by, but not limited to, the following:

6        •    HARTFORD engaged in procedural violations of its statutory obligations

7            under ERISA, including, but not limited to, failing to advise MR.

8            HEYMANN of what documentation it needed for him to perfect his claim

9            and failing to provide a complete copy of all documents, records, and

10           other information relevant to him claim despite a request by Plaintiff in

11           violation of 29 C.F.R. Section 2560.530-1(h)(2)(iii);

12       •    HARTFORD did not give proper weight to the Social Security

13           Administration's continued finding that MR. HEYMANN was disabled

14           from any occupation[12].

15       •    HARTFORD ignored the obvious, combed the record and has taken

16           selective evidence out of context as a pretext to deny Plaintiff's claim;

17       •    HARTFORD had the file reviewed by physicians retained by companies

18           that are financially conflicted; and,

19       •    HARTFORD ignored the opinions of MR. HEYMANN's treating

20           physicians.  Deference should be given to the treating physician's

21           opinions as there are no **specific**, **legitimate** reasons for rejecting the

22           treating physician's opinions which are based on **substantial evidence**

23           in the claim file.  Further, HARTFORD's **physician's** opinions do not

24           serve as **substantial evidence**, as they are not **supported by**

25           **evidence** in the claim file nor are they **consistent with the overall**

26

27

[12] A Plan administrator may not arbitrarily disregard a favorable ruling by the Social Security
28   Administration as, at a minimum, it provides support for the conclusion that an administrative agency
     charged with examining MR. HEYMANN's medical records found objective support for its favorable
     decision.

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1    ***evidence*** in the claim file.

2    29.    For all the reasons set forth above, the decision to deny disability

3    insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, sorely

4    contrary to the evidence, contrary to the terms of the Plan and contrary to law. Clearly,

5    HARTFORD abused its discretion in deciding to deny this claim as the evidence shows

6    its denial decision was arbitrary and capricious. Further, HARTFORD's denial decision

7    and actions heighten the level of skepticism with which a court views a conflicted

8    administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955

9    (9th Cir. 2006).

10    30.    As a direct and proximate result of the Defendants' failure to provide MR.

11    HEYMANN with disability benefits, MR. HEYMANN has been deprived of said benefits

12    from on or about January 19, 2007, to the present date.

13    31.    As a further direct and proximate result of the denial of benefits, MR.

14    HEYMANN has been required to incur attorney fees to pursue this action, and is entitled

15    to have such fees paid by defendants pursuant to 29 U.S.C. § 1132(g) (1), ERISA §

16    502(g) (1).

17    32.    A controversy now exists between the parties as to whether MR.

18    HEYMANN is disabled as defined in the Plan.  Plaintiff seeks the declaration of this

19    Court that he meets the Plan definition of disability and thus he is entitled to benefits

20    from the Plan. In the alternative, Plaintiff seeks a remand to the Plan Administrator for a

21    determination of Plaintiff's claim consistent with the terms of the Plan.

22    WHEREFORE, Plaintiff prays for relief against Defendants as follows:

23    1.    An award of benefits in the amount not paid MR. HEYMANN from on or

24    about January 19, 2007, to the date of judgment herein, together with interest at the

25    legal rate on each monthly payment from the date it became due until the date it is paid,

26    including, but not limited to, prejudgment interest at the rate of 10% pursuant to the

27    section 10111.2 of the California Insurance Code; or, in the alternative, a remand to the

28    Plan Administrator for a determination of Plaintiff's claim consistent with the terms of the

SHERNOFF BIDART
DARRAS ECHEVERRIA⌐
LAWYERS FOR INSURANCE POLICYHOLDERS

1    Plan;

2         2.    An order determining that MR. HEYMANN is entitled to payments so long

3    as he remains disabled as defined in the Plan;

4         3.    An order requiring HARTFORD to pay $110 a day, from the date first

5    requested, for each day in which HARTFORD failed or refused to comply with Plaintiff's

6    requests for information which HARTFORD was required, by statute/regulation, to

7    furnish pursuant to ERISA section 502(c) [29 USC sec. 1132(c)].

8         4.    For reasonable attorney fees incurred in this action; and

9         5.    For such other and further relief as the Court deems just and proper.

10

11    DATED:  May 16, 2008                    SHERNOFF BIDART DARRAS
                                              ECHEVERRIA, LLP
12
13
                                              FRANK N. DARRAS
14                                            Attorney for Plaintiff
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Group
# Benefits
# Plan

**Place logo here**

GROUP LONG TERM
DISABILITY BENEFITS

# EXHIBIT A

# TABLE OF CONTENTS

**Group Long Term Disability Benefits**

PAGE

CERTIFICATE OF INSURANCE ............................................................................................................................... 2
SCHEDULE OF INSURANCE ................................................................................................................................... 3
  Must you contribute toward the cost of coverage? ................................................................................................ 3
  Who is eligible for coverage? ................................................................................................................................ 3
  When will You become eligible? (Eligibility Waiting Period) .............................................................................. 4
ELIGIBILITY AND ENROLLMENT ......................................................................................................................... 5
  When does your coverage start? ............................................................................................................................ 5
  When will coverage become effective if a disabling condition causes you to be absent from work on the date it
  is to start? .............................................................................................................................................................. 6
  Can you change benefit options? ........................................................................................................................... 6
  When will a requested change in benefit options take effect? ............................................................................... 6
BENEFITS ................................................................................................................................................................... 7
  When do benefits become payable? ....................................................................................................................... 7
  When will benefit payments terminate? ................................................................................................................. 7
  What happens if you return to work but become Disabled again? ......................................................................... 8
CALCULATION OF MONTHLY BENEFIT .............................................................................................................. 9
  What is Rehabilitation? ........................................................................................................................................ 10
  Family Care Credit Benefit .................................................................................................................................. 10
  Cost-of-Living Adjustment .................................................................................................................................. 11
  Survivor Income Benefit ...................................................................................................................................... 11
  Extended Earnings Protection Benefit ................................................................................................................. 12
PRE-EXISTING CONDITIONS LIMITATIONS ..................................................................................................... 12
  Are there any other limitations on coverage? ...................................................................................................... 12
EXCLUSIONS ........................................................................................................................................................... 13
  What Disabilities are not covered? ...................................................................................................................... 13
TERMINATION ........................................................................................................................................................ 14
  When does your coverage terminate? .................................................................................................................. 14
  Does your coverage continue if your employment terminates because you are Disabled? .................................. 14
CONVERSION PRIVILEGE ..................................................................................................................................... 15
GENERAL PROVISIONS ......................................................................................................................................... 17
STATUTORY PROVISIONS ..................................................................................................................................... 20
  Wisconsin ............................................................................................................................................................. 20
DEFINITIONS ........................................................................................................................................................... 20
ERISA ........................................................................................................................................................................ 24

PS-M-90

**EXHIBIT A**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
(Herein called Hartford Life)

**CERTIFICATE OF INSURANCE**
Under
**The Group Insurance Policy**
**as of the Effective Date**
Issued by
**HARTFORD LIFE**
to
**The Policyholder**

This is to certify that Hartford Life has issued and delivered the Group Insurance Policy to The Policyholder.

The Group Insurance Policy insures the employees of the Policyholder who:
- are eligible for the insurance;
- become insured; and
- continue to be insured;

according to the terms of the Policy.

The terms of the Group Insurance Policy which affect an employee's insurance are contained in the following pages. This Certificate of Insurance and the following pages will become your Booklet-certificate. The Booklet-certificate is a part of the Group Insurance Policy.

This Booklet-certificate replaces any other which Hartford Life may have issued to the Policyholder to give to you under the Group Insurance Policy specified herein.

*Lynda Godkin*
Lynda Godkin, *Secretary*

*Lowndes A. Smith*
Lowndes A. Smith, *President*

Z-LTD(C001)

2

000022

**EXHIBIT A**

## SCHEDULE OF INSURANCE

Final interpretation of all provisions and coverages will be governed by the Group Insurance Policy on file with Hartford Life at its home office.

| | |
|---|---|
| Policyholder: | SAFEWAY INC. |
| Group Insurance Policy: | GLT-034594 |
| Policy Effective Date | January 1, 1996 |
| Plan Effective Date: | January 1, 2000 |

**The benefits described herein are those in effect as of March 1, 2000.**

This plan of Disability Insurance provides you with loss of income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy.

**Must you contribute toward the cost of coverage?**
Classes 1, 2, 3, and 4 must contribute toward the cost of coverage.
Class 5 does not contribute toward the cost of coverage.

**Who is eligible for coverage?**
Eligible Class(es):                          All Active Full-time Employees as follows:

Class 1                          Employees not covered by a collective bargaining agreement, excluding Vons Division Employees, but including
- Local 2920
- Pharmacists 10-341
- UFCW 13-0546
- Mechanics 06-0701
- Teamster 07-0722 and
- Teamster 07-0959 Hostler and Dispatchers (effective March 1, 2000)

electing the $12,500 maximum benefit

Class 2                          Employees not covered by a collective bargaining agreement, excluding Vons Division Employees, but including
- Local 2920
- Pharmacists 10-341
- UFCW 13-0546
- Mechanics 06-0701
- Teamster 07-0722 and
- Teamster 07-0959 Hostler and Dispatchers (effective March 1, 2000)

electing the $17,500 maximum benefit

Class 3                          Vons Division Employees electing the $12,500 maximum benefit

Class 4                          Vons Division Employees electing the $17,500 maximum benefit

Class 5                          Collectively bargaining Employees of
- International Union of Operating Engineers (IUOE), Local 99.
- Carpenters District Council International, Local 1694. and
- Painters. Local 51

**EXHIBIT    A**

034594(GLT)(2) 3rd Rev

Full-time Employees:
    With respect to Pharmacists                                           32 hours weekly
    With respect to all other Employees                        40 hours weekly'

**Maximum Monthly Benefit:**
    Classes 1, 3 and 5            $12,500
    Classes 2 and 4               17,500

**Minimum Monthly Benefit:**        $50

**Benefit Percentage:**            60%

**Annual Enrollment Period:**        Each Fall As Determined By The Employer. See Your Employer For
                                      Details.

**When will You become eligible? (Eligibility Waiting Period)**
You will be eligible for coverage on the first day of the month following the date on which You complete a waiting period of 1 calendar month(s) of continuous service.

The waiting period will be reduced by the period of time You were an Active Full-time Employee with the Employer under the Prior Plan.

The Elimination Period is the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following:
1.   with respect to classes
    a)   1, 2, and 5 - the first 6 consecutive month(s)
    b)   3 and 4 - the first 90 consecutive days
    of any one period of Disability; or
2.   with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program.

### MAXIMUM DURATION OF BENEFITS TABLE

| Age When Disabled | Benefits Payable |
|---|---|
| Prior to Age 60 | To Age 65, or for 60 months, if greater |
| Age 60 | 60 months |
| Age 61 | 48 months |
| Age 62 | 42 months |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69 to 75 | 12 months |
| Age 75 and older | 6 months |

The above table shows the maximum duration for which benefits may be paid. All other limitations of the plan will apply.

00002

**EXHIBIT A**

## ELIGIBILITY AND ENROLLMENT

**Who are Eligible Persons?**
All persons in the class or classes shown in the Schedule of Insurance will be considered Eligible Persons.

**When will you become eligible?**
You will become eligible for coverage on either:
1.  the Plan Effective Date, if you have completed the Eligibility Waiting Period; or if not
2.  the date on which you complete the Eligibility Waiting Period.

See the Schedule of Insurance for the Eligibility Waiting Period.

**How do you enroll?**
To enroll you must:
1.  complete and sign a group insurance enrollment form which is satisfactory to us; and
2.  deliver it to the Employer.

If you do not enroll within 31 days after becoming eligible, the following limitations will apply to a later enrollment:
1.  you must submit Evidence of Insurability satisfactory to us; and
2.  you may not enroll until an Annual Enrollment Period.

Any such enrollment must be made during the Annual Enrollment Period.

The dates of the Annual Enrollment Period are shown in the Schedule of Insurance.

**What is Evidence of Insurability?**
If you are required to submit Evidence of Insurability, you must:
1.  complete and sign a health and medical history form provided by us;
2.  submit to a medical examination, if requested;
3.  provide any additional information and attending physicians' statements that we may require; and
4.  furnish all such evidence at your own expense.

We will then determine if you are insurable under the plan.

## WHEN COVERAGE STARTS

**When does your coverage start?**
If you are not required to contribute toward the plan's cost, your coverage will start on the date you become eligible.

If you must contribute towards the plan's cost, your coverage will start on the date determined below:
1.  the date you become eligible, if you enroll or have enrolled by then;
2.  the date on which you enroll, if you do so within 31 days after the date you are eligible;
3.  the date we approve your Evidence of Insurability, if you are required to submit Evidence of Insurability, but not earlier than January 1; or
4.  January 1 following the Annual Enrollment Period if you enroll during an Annual Enrollment Period if Evidence of Insurability is not required.

000025

**EXHIBIT A**

## DEFERRED EFFECTIVE DATE

**When will coverage become effective if a disabling condition causes you to be absent from work on the date it is to start?**

If you are absent from work due to:
1. accidental bodily injury;
2. sickness;
3. pregnancy;
4. Mental Illness; or
5. Substance Abuse,

on the date your insurance or increase in coverage would otherwise have become effective, your effective date will be deferred. Your insurance, or increase in coverage will not become effective until you are Actively at Work for one full day.

## CHANGES IN COVERAGE

**Can you change benefit options?**

You may change to an option providing increased or decreased benefits or waive coverage only during an Annual Enrollment Period.

You may decrease coverage, or increase coverage to a higher option. An increase in coverage will be subject to your submission of Evidence of Insurability that meets our approval.

**When will a requested change in benefit options take effect?**

If you enroll for a change in benefit option during an Annual Enrollment Period, the change will take effect on the later of:
1. January 1 following the Annual Enrollment Period; or
2. the date we approve your Evidence of Insurability if you are required to submit Evidence of Insurability.

Any such increase in coverage is subject to the following limitations:
1. the Deferred Effective Date Provision; and
2. Pre-existing Conditions Limitations.

**Do coverage amounts change if there is a change in your class or your rate of pay?**

Your coverage may increase or decrease on the date there is a change in your class or Monthly Rate of Basic Earnings. However, no increase in coverage will be effective unless on that date you:
1. are an Active Full-time Employee; and
2. are not absent from work due to being Disabled.

If you were so absent from work, the effective date of such increase will be deferred until you are Actively at Work for one full day.

No change in your Rate of Basic Earnings will become effective until the date we receive notice of the change.

**What happens if the Employer changes the plan?**

Any increase or decrease in coverage because of a change in the Schedule of Insurance will become effective on the date of the change, subject to the following limitations on an increase:
1. the Deferred Effective Date provision; and
2. Pre-existing Conditions Limitations.

000026

EXHIBIT A

## BENEFITS

### When do benefits become payable?
You will be paid a monthly benefit if:
1. you become Disabled while insured under this plan;
2. you are Disabled throughout the Elimination Period;
3. you remain Disabled beyond the Elimination Period;
4. you are, and have been during the Elimination Period, under the Regular Care of a Physician; and
5. you submit Proof of Loss satisfactory to us.

Benefits accrue as of the first day after the Elimination Period and are paid monthly.

### When will benefit payments terminate?
We will terminate benefit payment on the first to occur of:
1. the date you are no longer Disabled as defined;
2. the date you fail to furnish Proof of Loss, when requested by us;
3. the date you are no longer under the Regular Care of a Physician, or refuse our request that you submit to an examination by a Physician;
4. the date you die;
5. the date your Current Monthly Earnings exceed:
   a) 80% of your Indexed Pre-disability Earnings if you are receiving benefits for being Disabled from Your Occupation;
   b) an amount that is equal to the product of your Indexed Pre-disability Earnings and the Benefit Percentage if you are receiving benefits for being Disabled from Any Occupation;
6. the date determined from the Maximum Duration of Benefits Table shown in the Schedule of Insurance;
7. the date no further benefits are payable under any provision in this plan that limits benefit duration; or
8. the date you refuse to cooperate with or try:
   a) modifications made to the work site or job process to accommodate your identified medical limitations to enable you to perform the Essential Duties of Your Occupation;
   b) adaptive equipment or devices designed to accommodate your identified medical limitations to enable you to perform the Essential Duties of Your Occupation;
   c) modifications made to the work site or job process to accommodate your identified medical limitations to enable you to perform the Essential Duties of Any Occupation, if you were receiving benefits for being disabled from Any Occupation; or
   d) adaptive equipment or devices designed to accommodate your identified medical limitations to enable you to perform the Essential Duties of Any Occupation, if you were receiving benefits for being disabled from Any Occupation,

   provided a qualified Physician agrees that such modifications or adaptive equipment accommodate your medical limitation; or
9. the date you refuse to receive recommended treatment that is generally acknowledged by physicians to cure, correct or limit the disabling condition.

EXHIBIT  A

## MENTAL ILLNESS AND SUBSTANCE ABUSE BENEFITS

**Are benefits limited for Mental Illness or Substance Abuse?**
If you are Disabled because of:
1.  Mental Illness that results from any cause;
2.  any condition that may result from Mental Illness;
3.  alcoholism; or
4.  the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance,

then, subject to all other Policy provisions, benefits will be payable:
1.  only for so long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
2.  when you are not so confined, a total of 24 months for all such Disabilities during your lifetime.

**Mental Illness** means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

## RECURRENT DISABILITY

**What happens if you return to work but become Disabled again?**
Attempts to return to work as an Active Full-time Employee during the Elimination Period will not interrupt the Elimination Period, subject to the following limitations:
1.  for an Elimination Period of 180 or more days, up to 30 such return-days are allowed;
2.  for an Elimination Period of less than 180 days, up to 5 such return-days are allowed for each 30 days of Elimination Period.

Any day you were Actively at Work will not count towards the Elimination Period.

After the Elimination Period, when a return to work as an Active Full-time Employee is followed by a recurrent Disability, and such Disability is:
1.  due to the same cause; or
2.  due to a related cause; and
3.  within 6 month(s) of the return to work,

the Period of Disability prior to your return to work and the recurrent Disability will be considered one Period of Disability, provided the Group Insurance Policy remains in force.

If you return to work as an Active Full-time Employee for 6 month(s) or more, any recurrence of a Disability will be treated as a new Disability. A new Disability is subject to a new Elimination Period and a new Maximum Duration of Benefits. The Elimination Period and Maximum Duration of Benefits Table are in the Schedule of Insurance.

The term "Period of Disability" as used in this provision means a continuous length of time during which you are Disabled under this plan.

## CALCULATION OF MONTHLY BENEFIT

**How are Disability benefits calculated?**

**Return to Work Incentive**
If you remain Disabled after the Elimination Period, but work while you are Disabled, we will determine your
Monthly Benefit for a period of up to 12 consecutive months as follows:
1.   multiply your Pre-Disability Earnings by the Benefit Percentage;
2.   compare the result with the Maximum Benefit; and
3.   from the lesser amount, deduct Other Income Benefits.

Current Monthly Earnings will not be used to reduce your Monthly Benefit. However, if the sum of your Monthly
Benefit and your Current Monthly Earnings exceeds 100% of your Pre-disability Earnings, we will reduce your
Monthly Benefit by the amount of excess.

The 12 consecutive month period will start on the last to occur of:
1.   the day you first start such work; or
2.   the end of the Elimination Period.

If you are Disabled and not receiving benefits under the Return to Work Incentive, we will calculate your Monthly
Benefit as follows:
1.   multiply your Monthly Income Loss by the Benefit Percentage;
2.   compare the result with the Maximum Benefit; and
3.   from the lesser amount, deduct Other Income Benefits.

The result is your Monthly Benefit.

**What happens if the sum of the Monthly Benefit, Current Monthly Earnings and Other Income Benefits
exceeds 100% of Pre-disability Earnings?**
We will reduce your Monthly Benefit by the amount of the excess.

**Minimum Monthly Benefit**
Your Monthly Benefit will not be less than the Minimum Monthly Benefit shown in the Schedule of Insurance.

**How is the benefit calculated for a period of less than a month?**
If a Monthly Benefit is payable for less than a month, we will pay 1/30 of the Monthly Benefit for each day you were
Disabled.

Benefit Percentages and Maximum Benefits are shown in the Schedule of Insurance.

**EXHIBIT  A**

## REHABILITATION

**What is Rehabilitation?**
Rehabilitation is a process of working together to plan, adapt, and put into use options and services to meet your return to work needs.

A Rehabilitation program may include, when we consider it to be appropriate, any necessary and feasible:
1.  vocational testing;
2.  vocational training;
3.  alternative treatment plans such as:
    a)  support groups;
    b)  physical therapy;
    c)  occupational therapy; and
    d)  speech therapy;
4.  work-place modification to the extent not otherwise provided; and
5.  job placement,

and similar services.

## FAMILY CARE CREDIT BENEFIT

**What if you must incur expenses for Family Care Services in order to participate in a Rehabilitative program?**
If you are working as part of a program of Rehabilitative Employment, we will, for the purpose of calculating your benefit, deduct the cost of Family Care from earnings received from a Rehabilitative program, subject to the following limitations:
1.  Family Care means the care or supervision of:
    a)  your children under age 13; or
    b)  a member of your household who is mentally or physically handicapped and dependent upon you for support and maintenance;
2.  the maximum monthly deduction allowed for each qualifying child or family member is:
    a)  $350 during the first 12 months of Rehabilitative Employment; and
    b)  $175 thereafter,
    c)  but in no event may the deduction exceed the amount of your monthly earnings;
3.  Family Care Credits may not exceed a total of $2,500 during a calendar year;
4.  the deduction will be reduced proportionally for periods of less than a month;
5.  the charges for Family Care must be documented by a receipt from the caregiver;
6.  the credit will cease on the first to occur of the following:
    a)  you are no longer in a Rehabilitative program; or
    b)  Family Care Credits for 24 months have been deducted during your Disability; and
7.  no Family Care provided by an immediate relative of the family member receiving the care will be eligible as a deduction under this provision. An immediate relative is a spouse, sibling, parent, step-parent, grandparent, aunt, uncle, niece, nephew, son, daughter or grandchild.

Your Current Monthly Earnings after the deduction of your Family Care Credit will be used to determine your Monthly Income Loss. In no event will you be eligible to receive a Monthly Benefit under the plan if your Current Monthly Earnings before the deduction of the Family Care Credit exceed 80% of your Indexed Pre-disability Earnings.

000030

**EXHIBIT A**

10

## COST-OF-LIVING ADJUSTMENT

### How do benefits keep abreast of inflation?
Your Monthly Benefit for Total Disability may increase in accordance with the Cost-of-Living formula described below. The Cost-of-Living Adjustment is made each year on January 1st. Your Monthly Benefit may increase under this formula provided you:
1.  have been Disabled for 12 consecutive months; and
2.  are receiving benefits when the Cost-of-Living Adjustment is made.

### What is the Cost-of-Living Formula?
To apply the Cost-of-Living Formula:
1.  determine the lesser of:
    a)  3%; or
    b)  1/2 the percentage change in the Consumer Price Index;
2.  multiply the resulting percentage (%) times the Monthly Benefit for Disability being received; and
3.  add the resulting amount to your Monthly Benefit.

### How long will Cost-of-Living Adjustments continue?
No Cost-of-Living Adjustment will be made after you cease to be Disabled or you have received 10 adjustments.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor. It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services. If the index is discontinued or changed, we may use another nationally published index that is comparable to the CPI-W.

For the purposes of this benefit, the percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31, and the prior year's CPI-W as of July 31, divided by the prior year's CPI-W.

"Totally Disabled," when used in this benefit, means that because of being Disabled, your Current Monthly Earnings are less than 20% of your Pre-disability Earnings.

## SURVIVOR INCOME BENEFIT

### Will your survivors receive a benefit if you should die while receiving Disability Benefits?
If you die while receiving benefits under this plan, a Survivor Benefit will be payable to:
1.  your surviving Spouse;
2.  your surviving Child(ren), in equal shares, if there is no surviving Spouse; or
3.  your estate, if there is no surviving Spouse or Child.

If a minor Child is entitled to benefits, we may, at our option, make benefit payments to the person caring for and supporting the Child until a legal guardian is appointed.

The Benefit is one payment of an amount that is 3 times the lesser of:
1.  your Monthly Income Loss multiplied by the Benefit Percentage; or
2.  the Maximum Monthly Benefit shown in the Schedule of Insurance.

The following terms apply to this Benefit:
1.  "Spouse" means your wife or husband who:
    a)  is mentally competent; and
    b)  was not legally separated from you at the time of your death; and
2.  "Child" means your son or daughter under age 25 who is dependent on you for financial support.

000032

EXHIBIT A

11

## EXTENDED EARNINGS PROTECTION BENEFIT

**Will benefits continue to be paid after your return to Active Full-time Employment if earnings are less than Pre-disability Earnings?**
This benefit protects your earnings level after you have returned to work as an Active Full-time Employee following a period of Disability.  To qualify for this Extended Earnings Protection Benefit, you must:
1.  have been Disabled under this plan and received a Monthly Benefit from us;
2.  now be working Full-time for the Employer or another employer;
3.  be performing all the Essential Duties of Your Occupation or another occupation;
4.  as a result of having been so Disabled, be currently earning less than 60% of your Pre-disability Earnings; and
5.  provide to us each month, satisfactory proof of your Current Monthly Earnings.

**What will the Benefit be?**
The Extended Earnings Protection Benefit will be the lesser of:
1.  the Maximum Monthly Benefit shown in the Schedule of Insurance; or
2.  your earnings loss multiplied by the Benefit Percentage.

Your earnings loss is the difference of your Pre-disability Earnings minus your Monthly Rate of Basic Earnings following your Disability.

**How long will benefits be paid?**
The Extended Earnings Protection Benefit will cease to be paid on the first to occur of the following:
1.  the date benefits have been payable for a maximum duration of 3 months;
2.  the date you are earning 60% of your Pre-disability Earnings; or
3.  the date you fail to submit to us satisfactory proof of your Current Monthly Earnings.

## PRE-EXISTING CONDITIONS LIMITATIONS

**Are there any other limitations on coverage?**
No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:
1.  after the last day of 90 consecutive day(s) while insured during which you receive no medical care for the Pre-existing Condition; or
2.  after the last day of 365 consecutive day(s) during which you have been continuously insured under this plan.

**Pre-existing Condition means:**
1.  any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
2.  any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;

for which you received Medical Care during the 365 day period that ends the day before:
1.  your effective date of coverage; or
2.  the effective date of a Change in Coverage.

**Medical Care** is received when:
1.  a Physician is consulted or medical advice is given; or
2.  treatment is recommended, prescribed by, or received from a Physician.

Treatment includes but is not limited to:
1.  medical examinations, tests, attendance or observation; and
2.  use of drugs, medicines, medical services, supplies or equipment.

**EXHIBIT  A**

## CONTINUITY FROM A PRIOR PLAN

**Is there continuity of coverage from a Prior Plan?**
If you were:
1. insured under the Prior Plan;
2. Actively at Work; and
3. not eligible to receive benefits under the Prior Plan,

on the day before the Plan Effective Date, the Deferred Effective Date provision will not apply to you.

If you become insured under the Group Insurance Policy on the Plan Effective Date and were covered under the Prior Plan on the day before the Plan Effective Date, the Pre-existing Conditions Limitation will cease to apply on the first to occur of the following dates:
1. the Policy Effective Date, if your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Plan; or
2. if your coverage was limited by a pre-existing condition restriction under the Prior Plan, the date the restriction would have ceased to apply had the Prior Plan remained in force.

The amount of the Monthly Benefit payable for a Pre-existing Condition in accordance with the previous paragraph will be the lesser of:
1. the Monthly Benefit which was paid by the Prior Plan; or
2. the Monthly Benefit provided by this plan.

No payment shall be made after the earlier to occur of:
1. the date payments would have ceased under the Prior Plan; or
2. the date payments cease under this plan.

If you received Monthly Benefits for Disability under the Prior Plan, and:
1. you returned to work as an Active Full-time Employee before the Effective Date of this plan;
2. within 6 months of the return to work, you have a recurrence of the same Disability under this plan; and
3. there are no benefits available for the recurrence under the Prior Plan,

the Elimination Period of this plan, which would otherwise apply to the recurrence, will be waived if the recurrence would have been covered without any further Elimination Period under the Prior Plan had it remained in force.

## EXCLUSIONS

**What Disabilities are not covered?**
The plan does not cover, and no benefit shall be paid for any Disability:
1. unless you are under the Regular Care of a Physician;
2. that is caused or contributed to by war or act of war (declared or not);
3. caused by your commission of or attempt to commit a felony, or to which a contributing cause was your being engaged in an illegal occupation; or
4. caused or contributed to by an intentionally self-inflicted injury.

If you are receiving or are eligible for benefits for a Disability under a prior disability plan that:
1. was sponsored by the Employer; and
2. was terminated before the Effective Date of this plan.

no benefits will be payable for the Disability under this plan.

EXHIBIT A

## TERMINATION

**When does your coverage terminate?**
You will cease to be covered on the earliest to occur of the following dates:
1.   the date the Group Insurance Policy terminates;
2.   the date the Group Insurance Policy no longer insures your class;
3.   the date premium payment is due but not paid by the Employer;
4.   the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;
5.   the date you cease to be an Active Full-time Employee in an eligible class including:
    a)   temporary layoff;
    b)   leave of absence, including but not limited to leave for military service; or
    c)   a general work stoppage (including a strike or lockout); or
6.   the date your Employer ceases to be a Participant Employer, if applicable.

**May coverage be continued during a temporary layoff?**
If you are temporarily laid off, the Employer may continue your insurance for 1 month(s) following the month coverage would have terminated subject to the following:
1.   the required premium must be paid;
2.   your benefit level, or the amount of earnings upon which your benefits may be based, will be that in effect on the day before said layoff commenced; and
3.   such continuation will cease immediately if one of the following events should occur:
    a)   the layoff becomes permanent;
    b)   the termination of the Group Insurance Policy;
    c)   non-payment of premium when due by the Policyholder or you;
    d)   the Group Insurance Policy no longer insures your class; or
    e)   your Employer ceases to be a Participant Employer, if applicable.

**May coverage be continued during a leave of absence?**
If you are granted a personal or non-family or medical leave of absence, the Employer may continue your insurance for 1 month(s) following the month coverage would have terminated subject to the following:
1.   the leave authorization is in writing or is documented as a leave for military purposes;
2.   the required premium must be paid;
3.   your benefit level, or the amount of earnings upon which your benefits may be based, will be that in effect on the day before said leave commenced; and
4.   such continuation will cease immediately if one of the following events should occur:
    a)   the leave terminates prior to the agreed upon date;
    b)   the termination of the Group Insurance Policy;
    c)   non-payment of premium when due by the Policyholder or you;
    d)   the Group Insurance Policy no longer insures your class; or
    e)   your Employer ceases to be a Participant Employer, if applicable.

**Does your coverage continue if your employment terminates because you are Disabled?**
If you are Disabled and you cease to be an Active Full-time Employee, your insurance will be continued:
1.   during the Elimination Period while you remain Disabled by the same Disability; and
2.   after the Elimination Period for as long as you are entitled to benefits under the Policy.

**Must premiums be paid during a Disability?**
No premium will be due for you:
1.   after the Elimination Period; and
2.   for as long as benefits are payable.

**EXHIBIT A**

14

**Do benefits continue if the plan terminates?**
If you are entitled to benefits while Disabled and the Group Insurance Policy terminates, benefits:
1.   will continue as long as you remain Disabled by the same Disability; but
2.   will not be provided beyond the date we would have ceased to pay benefits had the insurance remained in force.

Termination for any reason of the Group Insurance Policy will have no effect on our liability under this provision.

**May coverage be continued during a family or medical leave?**
If you are granted a leave of absence according to the Family and Medical Leave Act of 1993, your Employer may continue your insurance for up to 12 weeks, or longer if required by state law, following the date your coverage would have terminated, subject to the following:
1.   the leave authorization must be in writing;
2.   the required premium for you must be paid;
3.   your benefit level, or the amount of earnings upon which your benefit may be based, will be that in effect on the day before said leave commenced; and
4.   such continuation will cease immediately if one of the following events should occur:
     a)   the leave terminates prior to the agreed upon date;
     b)   the termination of the Group Insurance Policy;
     c)   non-payment of premium when due by the Policyholder or you
     d)   the Group Insurance Policy no longer insures your class; or
     e)   your Employer ceases to be a Participant Employer, if applicable.

## CONVERSION PRIVILEGE

**Under what conditions can your Long Term Disability Coverage be converted to another plan?**
If your insurance terminates because:
1.   your employment ends for a reason other than your retirement; or
2.   you are no longer in an eligible class,

and if:
1.   you have been continuously insured for at least 12 consecutive months under this plan or under this plan and the Prior Plan;
2.   you are under the Limiting Age, if any is shown in the Schedule of Insurance;
3.   a Disability is not preventing you from performing duties of Your Occupation;
4.   the insurance for your class or the plan has not terminated;
5.   you are not eligible for coverage under the plan under another class; and
6.   you are not eligible or covered for similar benefits under another group plan or an individual policy,

then you are eligible to enroll for personal insurance under another group policy called the Group Long Term Disability Conversion Policy.

Prior Plan, as used in this Conversion Privilege provision, means the plan(s) of group long term disability insurance that was/were provided or sponsored by the Employer and terminated on the day before the Plan Effective Date.

**How to convert**
To obtain coverage under the Group Long Term Disability Conversion Policy, the following must be done within 31 days of the termination of group insurance:
1.   a written enrollment request must be made to us; and
2.   the required premium and enrollment fee for the conversion policy must be paid.

000035

**EXHIBIT A**

If the preceding conditions are met, we will issue to you a certificate of insurance under the Group Long Term Disability Conversion Policy. Such coverage will:

1.  be issued without medical evidence of insurability;
2.  be on one of the forms then being issued by us for conversion purposes; and
3.  be effective on the day following the date your insurance under this plan terminates.

The coverage available under the conversion policy may differ from this plan. The terms of the Group Long Term Disability Conversion Policy, including:

1.  the type and amount of coverage provided; and
2.  the premium payable,

will be determined by the kinds of insurance being provided by the Group Long Term Disability Conversion Policy at the time such enrollment request is made.

000036

**EXHIBIT  A**

16

## GENERAL PROVISIONS

**What happens if facts are misstated?**

If material facts about you were not stated accurately:

1.  your premium may be adjusted; and
2.  the true facts will be used to determine if, and for what amount, coverage should have been in force.

No statement made by you relating to your insurability will be used to contest the insurance for which the statement was made after the insurance has been in force for two years during your lifetime. In order to be used, the statement must be in writing and signed by you.

**When should we be notified of a claim?**

You must give us written notice of a claim within 30 days after Disability starts. If notice cannot be given within that time, it must be given as soon as possible. Such notice must include your name, your address and the Group Insurance Policy number. You may give us such notice by calling 1-800-289-9140.

**Are special forms required to file a claim?**

When we receive a notice of claim, you will be sent forms for providing us with Proof of Loss. We will send these forms within 15 days after receiving a notice of claim. If we do not send the forms within 15 days, you may submit any other written proof which fully describes the nature and extent of your claim.

**What is Proof of Loss?**

Proof of Loss may include but is not limited to the following:

1.  documentation of:
    a)  the date your Disability began;
    b)  the cause of your Disability;
    c)  the prognosis of your Disability;
    d)  your Earnings or income, including but not limited to copies of your filed and signed federal and state tax returns; and
    e)  evidence that you are under the Regular Care of a Physician;
2.  any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
3.  the names and addresses of all:
    a)  Physicians and practitioners of healing arts you have seen or consulted;
    b)  hospitals or other medical facilities in which you have been seen or treated; and
    c)  pharmacies which have filled your prescriptions within the past three years;
4.  your signed authorization for us to obtain and release:
    a)  medical, employment and financial information; and
    b)  any other information we may reasonably require;
5.  your signed statement identifying all Other Income Benefits; and
6.  proof that you and your dependents have applied for all Other Income Benefits which are available. You will not be required to claim any retirement benefits which you may only get on a reduced basis.

All proof submitted must be satisfactory to us.

**When must Proof of Loss be given?**

Written Proof of Loss must be sent to us within 90 days after the start of the period for which we owe payment. If proof is not given by the time it is due, it will not affect the claim if:

1.  it was not possible to give proof within the required time; and
2.  proof is given as soon as possible; but
3.  not later than 1 year after it is due, unless you are not legally competent.

We may request Proof of Loss throughout your Disability. In such cases, we must receive the proof within 30 days of the request.

000037    EXHIBIT  A

**When must one apply for Social Security Benefits?**
You will be required to apply for Social Security disability benefits when the duration of your Disability meets the minimum duration required to apply for such benefits. If the Social Security Administration denies your eligibility for benefits, you will be required:
1.    to follow the process established by the Social Security Administration to reconsider the denial; and
2.    if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

**What additional Proof of Loss are we entitled to?**
We may have you examined to determine if you are Disabled. Any such examination will be:
1.    at our expense; and
2.    as reasonably required by us.

**Who gets the benefit payments?**
All payments are payable to you. Any payments owed at your death may be paid to your estate. If any payment is owed to your estate, a person who is a minor or a person who is not legally competent, then we may pay up to $1,000 to any of your relatives who is entitled to it in our opinion. Any such payment shall fulfill our responsibility for the amount paid.

**When are payment checks issued?**
When we determine that you are Disabled and eligible to receive benefits, we will pay accrued benefits at the end of each month that you are Disabled. We may, at our option, make an advance benefit payment based on our estimated duration of your Disability. If any payment is due after a claim is terminated, it will be paid as soon as satisfactory Proof of Loss is received.

**What notification will you receive if your claim is denied?**
If a claim for benefits is wholly or partly denied, you will be furnished with written notification of the decision. This written decision will:
1.    give the specific reason(s) for the denial;
2.    make specific reference to the Policy provisions on which the denial is based;
3.    provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and
4.    provide an explanation of the review procedure.

**What recourse do you have if your claim is denied?**
On any denied claim, you or your representative may appeal to us for a full and fair review. You may:
1.    request a review upon written application within 60 days of the claim denial;
2.    review pertinent documents; and
3.    submit issues and documents in writing.

We will make a decision no more than 60 days after the receipt of the request, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific references to the Policy provisions on which the decision is based.

**When can legal action be started?**
Legal action cannot be taken against us:
1.    sooner than 60 days after due Proof of Loss has been furnished; or
2.    three years after the time written Proof of Loss is required to be furnished according to the terms of the Policy (five years in Kansas; six years in South Carolina).

**What happens if benefits are overpaid?**
An overpayment occurs when it is determined that the total amount we have paid in benefits is more than the amount that was due to you under the plan. This includes, but is not limited to, overpayments resulting from:
1.    retroactive awards of Other Income Benefits;
2.    failure to report, or late notification to us of Other Income Benefits or earned income;
3.    misstatement; or
4.    an error we may make.

**000038**

**EXHIBIT  A**



We have the right to recover from you any amount that is an overpayment of benefits under this plan. You must refund to us the overpaid amount. We may also, without forfeiting our right to collect an overpayment through any means legally available to us, recover all or any portion of an overpayment by reducing or withholding future benefit payments, including the Minimum Monthly Benefit.

**What are our subrogation rights?**
If an Insured Person:
1.  suffers a Disability because of the act or omission of a third party;
2.  becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and
3.  does not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time,

then we will be subrogated to any rights the Insured Person may have against the third party and may, at our option, bring legal action to recover any payments made by it in connection with the Disability.

**How do we deal with fraud?**
Insurance Fraud occurs when you and/or your Employer, with the intent to injure, defraud or deceive us, provides us with false information or files a claim for benefits that contains any false, incomplete or misleading information. It is a crime if you and/or your Employer commit Insurance Fraud. We will use all means available to us to detect, investigate, deter and prosecute those who commit Insurance Fraud. We will pursue all available legal remedies if you and/or your Employer perpetrates Insurance Fraud.

**Who interprets policy terms and conditions?**
We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

**EXHIBIT A**

## STATUTORY PROVISIONS

### WISCONSIN

The following provision is applicable to residents of **Wisconsin** and is included to bring your Booklet-certificate into conformity with Wisconsin state law.

#### Subrogation

The following provision replaces the provision of the same title appearing in the General Provisions section of your Booklet-certificate.

#### What are our subrogation rights?

If an Insured Person:

1.   suffers a Disability because of the act or omission of a third party;

2.   becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and

3.   does not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time, then we will be subrogated to any rights the Insured Person may have against the third party and may, at its option, bring legal action to recover any payments made by it in connection with the Disability. Such right may be exercised only if the Insured Person has been, or will be, fully compensated for the lost wages.

## DEFINITIONS

The terms listed will have these meanings.

#### Actively at Work

You will be considered to be actively at work with your Employer on a day which is one of your Employer's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a Full-time basis on that day. You will be deemed to be actively at work on a day which is not one of your Employer's scheduled work days only if you were actively at work on the preceding scheduled work day.

**Active Full-time Employee** means an employee who works for the Employer on a regular basis in the usual course of the Employer's business. The employee must work the number of hours in the Employer's normal work week. This must be at least the number of hours indicated in the Schedule of Insurance.

**Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage; and the Maximum Monthly Benefit shown in the Schedule of Insurance.

**Bonuses** mean the monthly average of bonuses paid to you by the Employer over the 12 calendar months(s) ending just prior to the date you become Disabled, or over the number of calendar months of employment if less than this period. Bonuses will not be included if you have worked for the Employer fewer than 6 months.

**Current Monthly Earnings** means the monthly earnings you receive from:

1.   the Employer while Disabled;

2.   other employment.

However, if the other employment is a job you held in addition to Active Full-time Employment with the Employer, then:

1.   during the Elimination Period, and while eligible to receive benefits for being Disabled from Your Occupation;

2.   any earnings from this other employment will be Current Monthly Earnings only to the extent that such earnings exceed the average monthly earnings you were receiving from this other job during the 6 month period immediately prior to becoming Disabled.

**000040**

EXHIBIT   A

20

Current Monthly Earnings will also include the amount of pay for another or modified job position, which may be offered to you by the Employer or other employer, if you refuse the offer. The requirements of such position must be within your capabilities as described by your Physician, and consistent with your education, training and experience.

**Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
1.   accidental bodily injury;
2.   sickness;
3.   Mental Illness;
4.   Substance Abuse; or
5.   pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

**Employer** means the Policyholder.

**Essential Duty** means a duty that:
1.   is substantial, not incidental;
2.   is fundamental or inherent to the occupation; and
3.   can not be reasonably omitted or changed.

To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

**Indexed Pre-disability Earnings** when used in this policy means your Pre-disability Earnings adjusted annually by adding the lesser of:
1.   10%; or
2.   the percentage change in the Consumer Price Index (CPI-W).

The adjustment is made January 1st each year after you have been Disabled for 12 consecutive months, and if you are receiving benefits at the time the adjustment is made.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor. It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services. If the index is discontinued or changed, we may use another nationally published index that is comparable to the CPI-W.

For the purposes of this benefit, the percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31st, and the prior year's CPI-W as of July 31st, divided by the prior year's CPI-W.

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of the Group Insurance Policy.

**Monthly Income Loss** is the difference of your Pre-disability Earnings less your Current Monthly Earnings.

000041

**EXHIBIT A**

**Monthly Rate of Basic Earnings** means your regular monthly rate of pay from the Employer just prior to the date you become Disabled:

1. including contributions you make through a salary reduction agreement with the Employer to:
   a) an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement;
   b) an executive non qualified deferred compensation arrangement; or
   c) a salary reduction arrangement under an IRC Section 125 plan; and
2. not including bonuses,* commissions, overtime pay or expense reimbursements for the same period as above.

   * Except with respect to Classes 2 and 4, as defined in the Schedule of Insurance, page 4, bonuses are included in the Monthly Rate of Basic Earnings.

**Other Income Benefits** mean the amount of any benefit for loss of income, provided to you or to your family, as a result of the period of Disability for which you are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, to your family or to a third party on your behalf, pursuant to any:

1. temporary disability benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges for such benefits;
2. governmental law or program that provides disability or unemployment benefits as a result of your job with the Employer;
3. plan or arrangement of coverage, whether insured or not, or as a result of employment by or association with the Employer or as a result of membership in or association with any group, association, union or other organization;
4. individual insurance policy where the premium is wholly or partially paid by the Employer;
5. mandatory "no-fault" automobile insurance plan;
6. disability benefits under:
   a) the United States Social Security Act or alternative plan offered by a state or municipal government;
   b) the Canada Pension Plan, the Canada Old Age Security Act, the Quebec Pension Plan or any provincial pension or disability plan; or
   c) similar plan or act that you, your spouse and children are eligible to receive because of your Disability; or
7. disability benefit from the Veteran's Administration, or any other foreign or domestic governmental agency:
   a) that begins after you become Disabled; or
   b) if you were receiving the benefit before becoming Disabled, the amount of any increase in the benefit that is attributed to your Disability.

Other Income Benefits also mean any payments that are made to you, your family, or to a third party on your behalf, pursuant to any:

1. disability benefit under the Employer's Retirement Plan;
2. permanent disability or impairment benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges of such benefits;
3. portion of a settlement or judgment, minus associated costs, of a lawsuit that represents or compensates for your loss of earnings;
4. retirement benefit from a Retirement Plan that is wholly or partially funded by employer contributions, unless:
   a) you were receiving it prior to becoming Disabled; or
   b) you immediately transfer the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

   Other Income Benefits will not include the portion, if any, of such retirement benefit that was funded by your after-tax contributions; or

5. retirement benefits under:
   a) the United States Social Security Act or alternative plan offered by a state or municipal government;
   b) the Canada Pension Plan, the Canada Old Age Security Act; the Quebec Pension Plan or any provincial pension or disability plan; or
   c) similar plan or act that you, your spouse and children receive because of your retirement. unless you were receiving them prior to becoming Disabled.

EXHIBIT A

If you are paid Other Income Benefits in a lump sum or settlement, you must provide proof satisfactory to us of:
1.  the amount attributed to loss of income; and
2.  the period of time covered by the lump sum or settlement.

We will pro-rate the lump sum or settlement over this period of time. If you cannot or do not provide this information, we will assume the entire sum to be for loss of income, and the time period to be 24 months. We may make a retroactive allocation of any retroactive Other Income Benefit. A retroactive allocation may result in an overpayment of your claim. Please see the provision entitled "What happens if benefits are overpaid."

The amount of any increase in Other Income Benefits will not be included as Other Income Benefits if such increase:
1.  takes effect after the date benefits become payable under this plan; and
2.  is a general increase which applies to all persons who are entitled to such benefits.

**Physician** means a person who is:
1.  a doctor of medicine, osteopathy, psychology or other healing art recognized by us;
2.  licensed to practice in the state or jurisdiction where care is being given; and
3.  practicing within the scope of that license.

**Pre-disability Earnings** means your Monthly Rate of Basic Earnings in effect on the day before you became Disabled.

**Prior Plan** means the long term disability insurance plan(s) carried by the Employer on the day before the Plan Effective Date.

**Regular Care of a Physician** means you are attended by a Physician, who is not related to you:
1.  with medical training and clinical experience suitable to treat your disabling condition; and
2.  whose treatment is:
    a)  consistent with the diagnosis of the disabling condition;
    b)  according to guidelines established by medical, research and rehabilitative organizations; and
    c)  administered as often as needed,

    to achieve the maximum medical improvement.

**Retirement Plan** means a defined benefit or defined contribution plan that provides benefits for your retirement and which is not funded wholly by your contributions. It does not include:
1.  a profit sharing plan;
2.  thrift, savings or stock ownership plans;
3.  a non-qualified deferred compensation plan; or
4.  an individual retirement account (IRA), a tax sheltered annuity (TSA), Keogh Plan, 401(k) plan or 403(b) plan.

**Substance Abuse** means the pattern of pathological use of alcohol or other psychoactive drugs and substances characterized by:
1.  impairments in social and/or occupational functioning;
2.  debilitating physical condition;
3.  inability to abstain from or reduce consumption of the substance; or
4.  the need for daily substance use to maintain adequate functioning.

Substance includes alcohol and drugs but excludes tobacco and caffeine.

**We, us** or **our** means the Hartford Life and Accident Insurance Company.

**You, your, Insured Person** means the Insured Person to whom this Booklet-certificate is issued.

**Your Occupation**, if used in this Booklet-certificate, means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

000043

EXHIBIT A

**ERISA**

**The Following Important Notice
is Provided by Your Employer
for your Information Only.**

**Conforming Instrument**

For the purpose of meeting certain requirements of the Employee Retirement Income Security Act of 1974, the following information and the attached Claim Procedures and Statement of ERISA Rights are provided for use with your booklet-certificate to form the Summary Plan Description.

The benefits described in your booklet are provided under a group plan by the Insurance Company and are subject to the terms and conditions of that plan.

A copy of this plan is available for your review during normal working hours in the office of the Plan Administrator.

1.  **Plan Name**

    Safeway Group Health Plan

2.  **Plan Number**

    501

3.  **Employer/Plan Sponsor**

    Safeway Inc.
    5918 Stoneridge Mall Road
    Pleasanton, CA 94588-3229

4.  **Employer Identification Number**

    94-3019135

5.  **Type of Plan**

    Welfare Benefit Plan providing Group Long Term Disability.

6.  **Plan Administrator**

    Safeway Inc.
    5918 Stoneridge Mall Road
    Pleasanton, CA 94588-3229

**EXHIBIT** A

7.  **Agent for Service of Legal Process**

For the Plan:

Safeway Inc.
5918 Stoneridge Mall Road
Pleasanton, CA  94588-3229

For the Plan:

Hartford Life And Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a plan trustee or the plan administrator.

8.  **Sources of Contributions** -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee.  The Employer determines the portion of the cost to be paid by the employee.

9.  **Type of Administration** -- The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group policy.

10.  The Plan and its records are kept on a Policy Year basis.

11.  **Labor Organizations**

IUOE Local 99, Carpenters District Council International Local 1694, Painters Local 51, Local 2920, Pharmacists 10-341, UFCW 13-0546, Mechanics 06-0701, Teamster 06-0722, Teamster 07-0959 Hostler and Dispatchers

12.  **Names and Addresses of Trustees**

None

13.  **Plan Amendment Procedure**

The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

**EXHIBIT A**

**Statement of ERISA Rights**

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

1. Examine, without charge, at the plan administrator's office and at other locations (work-sites and union halls), all plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan with the U.S. Department of Labor, such as annual reports and plan descriptions.
2. Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.
3. Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary financial report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

If your claim for a welfare benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have the plan review and reconsider your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

**Claim Procedures**

1. Claims for Benefits -- An employee wishing to present a claim for benefits for himself or his insured dependents should obtain a claim form or forms from his Employer or Administrator. The applicable section of such form or forms should be completed by (1) Employee, (2) Employer or Administrator and (3) Attending Physician or Hospital.

   Following completion, the claim form or forms should be forwarded to the individual authorized to process and pay claims (Administrator or Insurance Company's Claim Representative). The individual authorized to process and pay the claims will compute benefits due, and will issue draft(s) in settlement. Unless the employee assigns benefits to a doctor or to a hospital, draft(s) will be made payable to the employee.

   A decision will be made by the Insurance Company no more than 90 days after receipt of due proof of loss, except in special circumstances (such as the need to obtain further information), but in no case more than 180 days after the due proof of loss is received. The written decision will include specific reasons for the decision and specific references to the plan provisions on which the decision is based.

EXHIBIT A

2. Appealing Denial of Claims -- If a claim for benefits is wholly or partially denied, notice of the decision **shall be** furnished to the employee. This written decision will:
   a) give the specific reason or reasons for denial;
   b) make specific reference to plan provisions on which the denial is based;
   c) provide a description of any additional information necessary to prepare the claim and an explanation of why it is necessary; and
   d) provide an explanation of the review procedure.

   On any denied claim an employee or his representative may appeal to the Insurance Company for a full and fair review. The claimant may:
   a) request a review upon written application within 60 days of receipt of claim denial;
   b) review pertinent documents; and
   c) submit issues and comments in writing.

   A decision will be made by the Insurance Company no more than 60 days after receipt of the request for review, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific reasons for the decision and specific references to the plan provisions on which the decision is based.

**EXHIBIT  A**

**The Plan Described in this Booklet**

**is Insured by the**

**Hartford Life and Accident Insurance Company**
Hartford, Connecticut

**Member of The Hartford Insurance Group**



Form 034594(GLT)(2) 3rd Rev.    THE
HARTFORD    Printed in U.S.A.  8-'00

**000048**    
EXHIBIT  A

E-filing

℀ JS 44 (Rev. 12/07)(cand rev 1-08)    **CIVIL COVER SHEET** PJH

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ANTHONY HEYMANN | HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY |

| (b) County of Residence of First Listed Plaintiff (EXCEPT IN U.S. PLAINTIFF CASES) Contra Costa | County of Residence of First Listed Defendant (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|
| (c) Attorney's (Firm Name, Address, and Telephone Number) SHERNOFF BIDART DARRAS ECHEVERRIA, LLP 3257 East Guasti Road, Suite 300 Ontario, CA 91761 (909) 390-3770 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | | ☒ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | ☐ 900Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities — | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities — | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §§1331,1337 & 29 U.S.C.§1132(a),(e),(f) & (g) of 1974 Employee Retirement Income Security Act
Brief description of cause:
claim by Plaintiff for Disability benefits under an employee benefit plan regulated and governed under ERISA

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)
☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE May 16, 2008    SIGNATURE OF ATTORNEY OF RECORD    , Frank N. Darras

ORIGINAL

American LegalNet, Inc. www.FormsWorkflow.com

```
Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611019304
Cashier ID: bucklew
Transaction Date: 05/20/2008
Payer Name: shernoff bidart and darras
-----------------------------------
CIVIL FILING FEE
 For: anthony heymann
 Case/Party: D-CAN-3-08-CV-002540-001
 Amount:      $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 96029
 Amt Tendered:  $350.00
-----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:      $0.00

pjh


Checks and drafts are accepted
 subject to collections and full
 credit will only be given when the
 check or draft has been accepted by
 the financial institution on which
 it  was drawn.
```